Earl S. McADAMS, Appellant,

v.

PAK–MOR MANUFACTURING COMPANY, Appellee.

No. 6111.

Court of Civil Appeals of Texas, Waco.

June 30, 1980.

Rehearing Denied July 31, 1980.

Dicky Grigg and J. Patrick Hazel, Spivey & Grigg, Austin, for appellant.

Jack Hebdon and Thomas H. Crofts, Jr., Groce, Locke & Hebdon, San Antonio, for appellee.

HALL, Justice.

This is a design defect strict liability case. Plaintiff Earl S. McAdams was an employee in the sanitation department of the City of Bellmead and engaged in collecting trash in a residential sector of the City when his right hand became caught in a pinch point on the refuse truck he and a helper were using. The pinch point was created every time the trash compactor blade passed a side loading door on the truck when the door was open. The body of the truck used for collecting trash, and its equipment, were designed and manufactured by defendant Pak-Mor Manufacturing Company. Medical treatment of plaintiff's injuries eventually resulted in complete amputation of his hand. Plaintiff filed this suit for his damages. The case was tried to a jury in December, 1978. Although the jury found in plaintiff's favor on the issues of defective design, injury causation, and damages, the jury also found that plaintiff voluntarily assumed the risk of the danger posed by the compactor blade and pinch point. Judgment was rendered on the verdict that plaintiff take nothing. Plaintiff brought this appeal. We reverse the judgment.

Plaintiff alleged *inter alia* that the refuse truck upon which he was injured was in a defective condition and unreasonably dangerous because it was defectively designed by defendant "in failing to equip the compactor in question with a hydraulic system where the door would be closed prior to the compactor blade passing the pinch point on the side loading door," and "in failing to equip the machine with an interlocking system which would require the doors to be closed prior to the packer blade passing the pinch point on the side loading door." Defendant denied the design defects asserted by plaintiff, and alleged that by reason of plaintiff's use of the truck and others like it, and because the pinch point was an open and obvious condition, plaintiff "knew of the danger, realized and appreciated the

nature and extent of the danger, voluntarily exposed himself to such danger, and assumed the risk of working with the particular opening that contained the pinch point that caused his injury."

In response to special issue number 1, the jury found that the trash compactor was defectively designed by defendant because it was not equipped with either the interlocking system or the hydraulic system pleaded by plaintiff. In answer to special issue number 2, the jury found that the defective design was a producing cause of plaintiff's injuries. And in response to special issue number 4 the jury found that plaintiff suffered damages totaling $101,218.00.

Special issue number 3 asked the jury whether plaintiff "voluntarily assumed the risk of the packer blade injuring his hand." In connection with this special issue the jury was given the following instruction:

"You are instructed that in order for Earl McAdams to 'assume the risk' of such danger, he must have actually known of the defective condition, if any, which caused his injury, if any, and must have actually and fully appreciated the nature and extent of the danger involved in encountering such defective condition, if any, and he must have voluntarily, of his own free will, which means by free and intelligent choice, encountered the danger of the defective condition that caused his injuries, if any."

The jury answered, "He assumed the risk."

Assumption of the risk is a proper defense in a strict liability action, including one based on design defect, but contributory negligence is not. *Henderson v. Ford Motor Company*, (Tex.1975) 519 S.W.2d 87, 90; *Pizza Inn, Inc. v. Tiffany*, 454 S.W.2d 420, 423 (Tex.Civ.App.—Waco 1970, no writ). The basic elements of the defense of assumed risk are (1) the plaintiff knew and fully appreciated the nature and extent of the dangerous condition, and (2) the plaintiff voluntarily encountered the danger or risk—which means by free and intelligent choice. *Adam Dante Corporation v. Sharpe*, (Tex.1972) 483 S.W.2d 452, 455;

*Henderson v. Ford Motor Company*, (Tex. 1975) 519 S.W.2d 87, 91.

In our case, plaintiff's two grounds for reversal of the judgment are that (1) there is no evidence to support the jury's finding that he assumed the risk; and, alternatively, (2) the finding is against the great weight and preponderance of the evidence. Plaintiff tacitly concedes knowledge and appreciation of the dangerous condition in question, but he contends that the evidence is legally and factually insufficient to support the finding that he voluntarily encountered the danger. Specifically, he argues that the only evidence on the question shows that he was acting instinctively and not by intelligent choice at the time of his injury.

The refuse collection equipment being used by plaintiff when he was injured, and the controls for operating the equipment, were manufactured and designed by defendant and installed by defendant on a truck chassis furnished by the City of Bellmead to defendant. The principal feature of the equipment is a large barrel-shaped body which extends from immediately behind the truck cab to several feet beyond the rear wheels of the truck. An aperture known as a "side loading door" for loading trash by hand into the truck body is located on each side of the body not far from the front end of the body (the truck cab end), about midway between the base and the top of the body. They are equipped with manually-operated doors which conform to the cylindrical shape of the body. The doors slide down to open and up to close. Each door is equipped with a handle for operation. A round packer blade which spans the diameter of the interior of the body is used for moving the loaded trash away from the doors and to the rear of the body. When at rest the blade is located in the space between the side loading doors and the front of the body. The blade is moved by a multi-stage telescoping hydraulic cylinder at its base. Separate controls permit use of the packer blade as a "sweeper" to remove loaded trash beyond the rear of the side loading doors, or as a "compactor" to push the loaded trash to the rear of the body and compact it there for eventual unloading through a rear door. When the packer blade begins moving toward the rear of the body for sweeping or compacting trash, a "pinch point" is created where the blade passes the rear sides of the side loading doors; and as the blade returns to rest, a similar pinch point is created where the blade passes the front sides of the doors. These are "classic" pinch points. They are open and obvious to view, and their presence and the danger they pose are well known and appreciated by the workers who use the side-loading trucks like this one owned by the City of Bellmead. If the side loading doors are closed before the packer blade is placed in use, the danger of the pinch points is completely eliminated.

The truck in question is also equipped with a device known as a container loader for collecting trash from large metal containers located in the commercial districts of the City which cannot be manually lifted. This loader is located only on the driver's side of the truck body. It consists of a metal rail placed near each side of the side loading doors, two cables, and a covered door known as a "hopper" in the top of the body between the rails. The cables lift the large metal containers along the rails to the top of the body, the hopper opens automatically, the container becomes inverted, and the trash falls into the body of the truck. Release controls then lower the container to the ground, the hopper closes, and a positioning arm pushes the container clear of the truck. Except for attaching the cables to the metal containers, the container loader, including the opening and closing of the hopper door, is operated hydraulically. Its use requires that the side loading doors be closed, else the trash falling into the body through the hopper located directly over the side doors will spill out the doors.

Plaintiff was born in August, 1950. He has a nervous temperament and has been nervous as long as he can remember. He was a slow learner in school, and was placed in special education classes. Under that program, he went to school part of the day and worked part of the day. He has raised

pigeons as a hobby since childhood. Also, he had begun raising a few head of cattle, caring for them himself, about a year prior to his injury. Plaintiff is married, and he and his wife have a son who was born in 1970. His wife is a nurse in the intensive care unit of a local hospital.

Plaintiff began his employment with the City of Bellmead in the summer of 1969 as a helper on a refuse collection truck. Prior to this job he had a work history of unloading lumber trucks, building mobile homes, and cleaning air filters. After he had worked for the City about six months he obtained a commercial driver's license and became the driver of a refuse truck. Although he was the driver, he also aided his helpers in loading trash into the truck. Because of the loss of his hand in the accident in question, plaintiff could not continue working in the trash collection department. However, since his recovery he has continued working for the City on another job. During the six years he worked in trash collection he was assigned to and used only side loaders manufactured by defendant. All were like the one in question in all material respects except for the container loader device used in commercial areas of the City. On all, the sweep movement and the compactor movement of the packer blade are activated by separate control handles known as "deadman controls" located on each side of the body between the side loading doors and the front end of the body. These controls are called "deadman controls" because they must be held in "on" position to activate the packer blade. If released by the operator they automatically revert to "off" position and stop the movement of the blade.

The equipment in question, installed on the truck chassis, was delivered to the City by defendant in July, 1974. Plaintiff had used the truck and the equipment most of the time since its delivery. 90% of plaintiff's weekly trash pickups are made in the commercial districts. The remaining 10% are made in residential areas. However, all commercial sites do not have the metal containers, and plaintiff used the container loader only about 70% of the time in the commercial pickups. The remaining 30% were handled manually through the side loading doors. The heaviest residential pickup days were Tuesdays and Fridays, and on those days plaintiff first ran residential routes for about two hours to aid the other employees working the residential pickups. The city manager of the City testified, "we have a policy that when the pickup boys get through with their routes they can go home and they are all eager to work together to get the job performed where they can go home. If it happens early, that's fine. So normally on Tuesdays and Fridays the commercial truck would help those boys try to speed up the [residential] routes because everybody when they all get in they can go home. So if one truck goes in, he has to go out and help the others. That's the routine. It is a very close operation where they all work together."

The accident in question occurred on Friday, October 17, 1975. Plaintiff and a helper named Lynn Hargrove were working a residential route. Hargrove had worked about two years as a helper on City's refuse trucks prior to the day of the accident, and during most of that time he was assigned to trucks equipped with side loaders manufactured by defendant. When Hargrove first went to work for the City, he worked with plaintiff as plaintiff's helper for about three months on a side loader, and he was trained by plaintiff in the use of the side loaders. Because of the doors on both sides of the truck for loading trash from each side of the street, and because the deadman controls for operating the packer blade are also located on both sides of the truck, Hargrove said that he and plaintiff (and the other employees with whom they worked) "would holler—which one was packing the truck—if we weren't on the same side. But if we were on the same side, either of us would pack it. If we were on opposite sides we would holler, 'Are you clear from the truck?' And if you weren't, you would say, 'No.' And if we were, we would say, 'Yes, I am.'" He said that they usually operated the packer blade with the side loading doors

open so that they could see each other. Hargrove had worked with plaintiff several times on the truck in question. The last time they had worked together before plaintiff was injured was about one month prior thereto.

On the day of plaintiff's injury, plaintiff and Hargrove began work between 7:30 A.M. and 8:00 A.M. Their schedule called for working residences for about two hours, then working plaintiff's commercial route the rest of the day. About 9:00 A.M. they stopped the truck on the driver's side of the street in a residential area to load trash. It was during this pickup that plaintiff was injured.

Other than plaintiff and Hargrove, there were no known witnesses to the circumstances surrounding plaintiff's injury. Hargrove gave the following account:

"I had finished my one stop, there, and I went around the truck because that stop had quite a few cans, and I was helping Earl finish it up. We were then both on the same side of the truck, the driver's side. We were hand-dumping the cans into the opening on the truck. I was standing by the packer, and Earl had went to take his cans that he had just emptied back to the place. And I went to pack the truck; and I saw Earl go back to the garbage container, where he had to put the cans. And I was looking over the cab of the truck to see my next stop while I was using the packer control handle. And I looked to see if Earl was out of the way, first, before I ever did anything; and he was walking back. And I never did see him when he came back up to the truck. And I heard him scream and I released the packer. And that's about all that I can remember.

"I am right-handed. I don't remember which hand I was using, but I leaned a little towards the cab of the truck, towards the front of the truck, to see my next stop, to see how much I had over there, so, if I needed any help, I could tell Earl that I needed some help. When I turned around to see where he was before I pushed the handle, he had taken the cans back; and he was still putting them up. And then I turned around, and I started packing the truck. Earl was approximately five feet away from the truck at that time. I pushed the handle, and I heard the motor rev up. That's what it does when the packer handle is pushed in. It was a quiet neighborhood, and there was no other noise in the neighborhood except the operation of the truck. When I pushed the handle the packer was all the way back to the front of the truck. I used the handle that sweeps the trash. When the handle is pushed in, there is no delay before the compactor begins to move.

"We had used the packer about eight times that morning. Earl had used it about four times, and this was about my fourth time. I did not yell at Earl before I started the compactor, because we were on the same side of the truck. When we were on the same side, we would see where each other was; and we would know that, if we were standing there, that we wouldn't say nothing. When I saw him five feet away, he was putting a garbage can down. I don't think there were any other cans to unload at that stop. When I heard Earl scream I let go of the packer handle and turned towards where he was. He had turned from the truck and went about two or three feet up into the yard. I never did actually see Earl at the truck."

Although plaintiff remembered that Hargrove was his helper that day, and that the accident happened on Friday when they were working residential pickups, he testified that he does not remember where the truck was parked, or what he was doing or what he had done, or anything about the occurrence of the accident. He said that "having to open and close the doors" on the side loading openings "slowed down the work considerably," and that for that reason, when working residential routes he left the door partially open, "about half way down." He testified, "I couldn't put it all the way down, because the garbage, you couldn't put as much in the truck. You couldn't put maybe two cans in there. If

the wind was blowing, it would blow it out the other side. We had to leave the door raised about half way up. You had to raise it up. Up to where you could reach it. If you put it all the way down, then it would be too low. Sometimes the wind would cause the garbage to blow out into the street." He said that "when the door was up the way you ordinarily use it, it would be in the neighborhood of five or five and a half feet off of the ground."

Plaintiff estimated the time required for the compactor blade to move from rest position to the pinch point on the rear side of the door to be "somewhere about 2 or 3 seconds." Additionally, he testified that "with this model truck you had problems where occasionally the trash would spill out as the blade came back," but that he did not remember if trash came out the day he was injured.

Hargrove also testified that the side loading doors were left open on residential routes, and that with the doors open garbage would sometimes "spill over the edge of the opening." He said that on the occasion in question the door had been raised about one and one-half feet from full-open, and that the side loading door "was about three-foot open, between the top and bottom of the opening." Hargrove said that he had never seen plaintiff attempt to push spilling trash back into the opening when the compactor blade was in motion. Plaintiff was not asked whether he had ever attempted such action.

Hargrove also gave this testimony: "Q. From what you saw out there, do you know of any reason in the world why he [plaintiff] had his hand inside the truck, so as to get it caught by the compactor? A. Only if there was some garbage about to spill or something is what I can think of as to why he would put his hand up there. Q. But you did not see any that might have spilled? A. That was a very vivid day—that morning—because, after—I mean, I don't remember if there was any garbage on the street or what."

The operation of the side loader trucks when they are parked for loading trash causes three distinct and easily discernible noises, and the employees who work the trucks are familiar with those sounds and understand their meanings. There is the idling noise of the truck motor when the truck is parked; there is a second and louder noise when the "power gear" is engaged for shifting the power of the motor for operation of the compactor; and there is a third gear-and-motor noise when the compactor is actually engaged through the use of the deadman controls, which is "a peculiar whining-type noise." As we have already stated, the evidence shows that at the time of plaintiff's injury the truck was parked in a quiet neighborhood, and the only audible noises were those coming from the truck.

The evidence is virtually undisputed, if not wholly so, that the pinch point created by the movement of the blade as it passes the open loading door is an open and obvious condition, that plaintiff was fully aware of it and the danger it posed, and that plaintiff was familiar with and understood the meaning of the distinct noises of the gears and motor of the truck emitted during the operation of the equipment in question.

Plaintiff's expert witness Dr. Hugh Walls is a professor of mechanical engineering at the University of Texas at Austin, and he is also a private consultant in mechanical engineering. He testified that "at the maximum there is something approaching five seconds" between the time when the deadman control is depressed and the whining noise begins and the time the packer blade passes the pinch point at the rear side of the opening "where Mr. McAdams got his hand pinched." He also said that when the blade was on a "sweep mode" "it appeared to take about three seconds" for the blade to cross the door. Carl Schulz, defendant's expert witness who is a designer engineer for a company that manufacturers "refuse bodies" testified that the opening on the truck upon which plaintiff received his injury is approximately forty inches wide; that the blade would be traveling approximately 1.13 miles per hour if it crossed the opening

in two seconds; that the blade would be traveling .75 miles per hour if it crossed the opening in three seconds; and that "relating it to something that you might understand better, walking speed is approximately four miles per hour, [and] if we said three seconds we are talking about one-fifth of the speed of a mother pushing a baby carriage down the street."

Plaintiff's other expert witness was Frank E. Fowler, a consultant in safety engineering. His specialty in that field is called the "Human Factors" which he said "concerns the analysis of how the human being uses a product, what kind of strengths and weaknesses does the human being have, what dangers might they be exposed to, and how can we design something to prevent something from happening. It also concerns how can we best design it so that you can use it the best way." He holds a master's degree in experimental psychology, and his research toward that degree "was done in the area of human performance, the ability of the human being to do and react and perceive various type things." He expressed the opinion that if at the time in question plaintiff was attempting to push spilling trash back into the truck when the blade was crossing the opening, then plaintiff's action was an involuntary response or a "reflex action." He testified as follows:

"Human reaction time, it will vary a little bit depending upon us as human beings, the thing we are trying to do; and in psychology it is called, what is the initial stimulus that we get to tell us we have something we have to do or not to do? In this case, you have about two seconds . . . [as this thing goes by] . . . until the time it goes to the danger point where it can catch you. If you make an inadvertent reaction or an involuntary response and the cycle has started, you probably won't be able to consciously realize the danger and pull your hand back, because at any point as the blade is coming, if it is an involuntary response or a reflex action, you can have considerably less than two seconds . . . And so, if you are talking about a maximum of two seconds, you are talking about a marginal time frame for someone to react . . . Here, we are talking probably about a reflex action.

"In other words, it is an involuntary action in that you are trying to keep the trash from spilling out . . . It is like somebody tossing you a coin and you go to catch it. It is something you don't particularly think about . . . And because of the design itself, it causes what I would call a 'trap' in that when the stuff falls, in psychological terms, when you see it falling out you try to push it back in and you really can't help your reaction. This is probably the key reason to guard it. That type of reaction, when the trash is spilling out is not one that takes the intelligence or the thought process to think out the reaction. What we are talking about here would be a reflex action which you do automatically, and by the time you do it and if the blade is at the wrong place, you have got a predictable injury occurring. It is not voluntary, it is just a reaction."

On cross examination, Fowler was asked a hypothetical question which assumed as facts that at the time the blade began the sweep and the whining noise began, plaintiff was five feet away from the truck and facing away from the truck. The question ended, "wouldn't you agree with me, if he was that far away when the sweep mode started, he had to intentionally go over and put his hand in front, evidently to save time by not letting the trash he saw spill out of the truck, that he intentionally put his hand in there trying to push that trash back in, making a distance of five feet? Don't you agree that was an intentional act on Mr. McAdams's part to get the trash in there and inside the truck?" Fowler answered, "I would have to totally disagree. That was an unintentional act because of the situation, and that is why you have to guard these things."

Plaintiff's witness Dr. Hugh Walls gave this testimony on cross examination: "Q. [The pinch point] is a totally open and obvious condition? A. I agree with you. Yes,

sir. Q. And there is really nothing more obvious when you are standing there and watching the blade go by and knowing that that blade is going by? A. If you are looking at it, that is correct, sir. Q. And under the facts of this accident that you have been asked to assume from the other witnesses, there is no question but that Mr. McAdams was looking at that blade at the time, presumably pushing trash back into it at the time that he got injured? A. I have not heard it stated that way. I have heard it speculated that he was trying to catch some trash that was falling out and shove it back in. Now, I would assume under that circumstances and depending upon how much time he had, he might have seen it, but I don't know whether he did or not. Q. Well, assume that he came from five feet away to do this, then he must have seen the blade coming or at least know why the trash was falling out with the experience he had in the refuse collecting? A. Well, if he started from five feet away he would have seen the blade near the start of its sweep and if there was something falling out, as has been speculated, and he tried to shove it back in, why he may have been focused on that and just not realize how fast that blade was coming up on him, because he had to cover that five feet if that was the distance. Q. But he would know why the trash was coming out because the blade was coming? A. Oh! Yeah! I would think that is true, but he would see it falling and I suspect he rather instinctively tried to shove it back up into there. Q. Well, now, his six years of experience would make that less on the basis of instinct and more on the basis of 'Well, let's not get any trash on the ground because I will have to pick it up.' It would be with an experienced person a more conscious effort than with an inexperienced person? A. I would really think that he could answer that better than I."

■ Is the jury's finding that plaintiff "by free and intelligent choice encountered the danger of the [pinch point] that caused his injury" supported by any evidence? If it is, is the finding against the great weight of the evidence? Proper determination of the first question permits consideration of

only the evidence and its inferences which support the finding, but resolution of the second question requires consideration of all of the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1950). Under those rules, we answer "yes" to both questions.

■ "[The law] only demands the best proof of a transaction that it is susceptible of, and when that is produced then it becomes a question whether or not its probative force is such as to establish its existence." *Birmingham v. Gulf Oil Corporation*, (Tex.1974) 516 S.W.2d 914, 917; *Miller v. Fleming*, 149 Tex. 368, 233 S.W.2d 571, 575 (1950). In our case, only plaintiff knew the exact circumstance of his injury, and he said that he has no memory of it. Defendant adduced an abundance of evidence showing plaintiff's knowledge and appreciation of the pinch point and its danger, and showing his familiarity with the distinct noises produced by the different operations of the equipment on the truck and their meaning. Although in our view a close question, we believe those circumstances and the evidence (1) that plaintiff was five feet from the truck when the packer blade was engaged, (2) that "the only reason in the world why he had his hand inside the truck so as to get caught by the compactor" was because "there was some garbage about to spill or something" during which time the packer blade and its movement would have been in full view, (3) that plaintiff had an unusually long workday ahead and other reasons for wanting to avoid the loss of time caused by the garbage spill, and (4) his lack of memory of what happened, are sufficiently probative to support the jury's finding that he voluntarily chose to risk the danger posed by the moving blade. On the other hand, we believe the evidence that plaintiff was familiar with the pinch point and the great danger it posed, that the spilling of garbage was not an uncommon occurrence when the blade was operated with the doors open, that the only witness who had worked with plaintiff on the trucks had never seen plaintiff attempt to push spilling trash back into the truck when

the blade was in motion, that plaintiff would have known the blade was moving toward the pinch point, that the blade traversed the door opening in two or three seconds, and that plaintiff and the other workers were always careful to stand clear of the trucks when the blade was in motion, militate against the assumption that plaintiff freely and intentionally chose to risk the danger of the impending pinch point when he attempted to push the spilling trash back into the truck (if that is what he did), and that those circumstances more strongly support a showing that such action by plaintiff was instinctive or inadvertent. Accordingly, in the light of the whole record, we hold that the finding in question is against the great weight and preponderance of the evidence.

Special issue number 1 asked the jury whether "the trash compactor in question manufactured by Pak-Mor, Inc., was defectively designed in that it failed to equip the machine with an interlocking system which would require the doors to be closed prior to the packer blade passing the pinch point on the side loading door, or failed to equip the compactor in question with a hydraulic system where the door would be closed prior to the compactor blade passing the pinch point on the side loading door?" In connection with this special issue the jury was given the following instructions:

"You are instructed that 'defectively designed,' as used in this Issue, means a trash compactor so designed that it would create an 'unreasonable risk of harm.'"

"You are instructed that the term 'unreasonable risk of harm,' as applied to the design of a product, is meant that the product, as manufactured according to such design, threatens harm to persons using the product to the extent that any product so designed would not be placed in the channels of commerce by a prudent manufacturer aware of the risk involved and its use, or to the extent that the product so manufactured would not meet the reasonable expectations of the ordinary consumer as to safety."

The jury answered the issue, "It was defectively designed."

This case was tried in December, 1978, after the decision of our Supreme Court in *Henderson v. Ford Motor Company,* (Tex. 1975) 519 S.W.2d 87, but the trial court's judgment became final prior to the Supreme Court's decision in *Turner v. General Motors Corp.,* (Tex.1979) 584 S.W.2d 844. We notice this because it is clear that the instruction to the jury on the meaning of "unreasonable risk of harm" which included the elements of "ordinary consumer" and "prudent manufacturer" was taken from language in *Henderson* (at 519 S.W.2d 92). Subsequently, in *Turner* (at 584 S.W.2d 847), the Court rejected the inclusion of those elements in the instruction.

■ Defendant asserts in a cross point that regardless of the merit of plaintiff's complaints the judgment is correct because there is no evidence to support the finding that the trash compactor was defectively designed. We disagree. The design defects upon which the jury's finding was based were that the side loading doors on the truck in question could only be closed manually and were not equipped with a hydraulic system which would automatically close the doors when the compactor blade was engaged, and that there was not an interlocking system of electric switches which would prohibit the operation of the blade until the doors were closed. The evidence shows that the hydraulic door-closer and the interlocking switch system are options provided by defendant which are actually placed on the trucks when requested by the purchaser, and that the cost of their installation is $500.00 to $600.00. There is a great amount of evidence to the effect that without at least one of those safety features the truck in question was unreasonably dangerous, and known to be so by defendant. Without detailing that evidence, we hold it is legally sufficient to support the finding of defective design under the court's charge to the jury on the issue.

In its other cross point defendant contends the evidence is factually insufficient to support the finding of defective design, and it seeks a retrial on that basis. We

need not rule upon this complaint since our decision on plaintiff's second point of error requires that the case be remanded to the trial court for another trial.

The judgment is reversed, and the case is remanded to the trial court.