Jerry HARPER, Appellant,

v.

NAMCO, INC., et al., Respondents.

No. WD 40173.

Missouri Court of Appeals,
Western District.

Jan. 10, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 1989.

Stanley L. White, Detroit, Mich., James A. Rahm, Carrollton, for appellant.

David A. Oliver, Columbia, for respondents.

Before COVINGTON, P.J., and NUGENT and GAITAN, JJ.

GAITAN, Judge.

Plaintiff (appellant), Jerry Harper, filed suit against defendant (respondent), Moentmann Brothers, Inc., along with defendants NAMCO, Inc., Clifton Wood and Florence Shannon, for negligence, strict liability, reckless and wanton conduct, and breach of warranties. The actions against NAMCO, Inc., Clifton Wood, and Florence Shannon were dismissed prior to trial. Plaintiff appeals the jury verdict against him, alleging that the trial court erred in the following respects: (1) by instructing the jury on contributory fault in this strict liability case; (2) by modifying the jury instructions during the reading of those instructions to the jury without knowledge of counsel; (3) by permitting a juror to leave the jury room during deliberation without notice to the court or counsel; and (4) by failing to sustain plaintiff's motion for directed verdict. We affirm.

Defendant had sold a Model 60 Grain–O–Vator (GOV) silage wagon to Melvin Clevinger in 1965. Mr. Clevinger used the GOV for several years, during which time he experienced problems with it including the slat conveyor breaking several times. Subsequently the wagon was left in a broken down condition along a fence near his barn. In the fall of 1980, Mr. Clevinger's son sold the wagon to plaintiff, Jerry Harper. The GOV had sat outdoors for ten years and rusted prior to the sale to plaintiff.

Plaintiff, a high school graduate, has lived on a farm all his life and has driven tractors since the age of nine. He learned machinery repair from his father and had a large, well-stocked shop on his farm to maintain his farm equipment. He purchased the GOV for $275, and made repairs himself. He obtained some wheels for the silage wagon, put in a new floor and made a couple of slats which moved along the floor to move the contents of the silage wagon. The chains on the outside of the wagon were used to drive three rotating beaters near the front of the wagon. These beaters each had knives or teeth and were designed to break up silage before it moved into a conveyor, if silage was being discharged from the front. In order to save on chains, plaintiff used only one chain on one side of the silage wagon to operate the beaters. The unit had been designed to have chains operate the beaters from both sides, with all of them turning the same direction. By using only one chain, the middle beater was caused to rotate in one direction while the upper and lower beaters operated in the other direction. The entire mechanism was operated by a power take-off (PTO) from a tractor.

Plaintiff used the wagon twice daily to feed his calves from approximately December 1, 1980 until January 27, 1981, the date he sustained his injuries. Plaintiff testified that during the time he operated the wagon, he knew of no way to operate the side chute conveyor without the beaters rotating.

Defendant Moentmann Brothers, distributed the GOV manufactured by North American Manufacturing Company. The subject wagon consisted of a rectangular box which sat on dual wheels. The silage or feed is placed in the bed of the wagon which is approximately six feet wide, twelve feet deep and three feet high. The floor of the GOV consists of slats which are normally driven by two chains, one on each side. When in operation, the conveyor floor slowly moves forward directing the silage into three steel beaters. The silage is then dropped into a side chute conveyor which transports the silage out of the wag-

on and into a feed bunk. The disengagement of the clutch for the slat conveyor would not disengage the three beaters.

Mr. Earl Moentmann, president of Moentmann Brothers, testified that when he inspected the GOV in 1987 at the Harper farm, it operated in substantially the same manner as it had when it was sold new to Mr. Clevinger. Additionally, Mr. Sevart, plaintiff's expert witness, testified that the Model 60 GOV was defectively designed and not reasonably safe for its reasonably foreseeable use. The GOV did not have warnings other than those which came on the machine from the manufacturer.

On the morning of January 27, 1981, plaintiff loaded the wagon box with silage and began filling the feed bunks. He had filled four of the feed bunks and had just begun filling the fifth when he noticed that the silage had stopped discharging into the bunk. Plaintiff turned off the power to the wagon, climbed out the side of the wagon to see if he could determine where the chain had broken. Being unable to see where the chain had broken, plaintiff restarted the power, got his shovel, and climbed into the back of the wagon. He shoveled the silage under the beaters and into the discharge conveyor as he had done several times before without any problems. He had filled the fifth bunk when he discovered that the chain had broken right under the beaters. He was looking down at the chain when he felt a tugging on his right coverall leg. Plaintiff attempted to pull his coverall free, but could not. He then braced his hands across the top of the beaters. The next thing plaintiff remembers was lying on the discharge chute on the other side of the beaters. When he tried to get up, it was then that he saw that his right arm was gone.

Plaintiff was hospitalized at the University of Missouri Hospital and Clinic from January 27, 1981 through March 20, 1981. He underwent several surgeries on his right shoulder, vigorous rehabilitation and further corrective surgery.

### I.

■ The plaintiff cites, in support of his position, that the trial court erred in sub-

mitting an instruction on comparative fault *Lippard v. Houdaille Industries, Inc.,* 715 S.W.2d 491 (Mo. banc 1986). While it is true that this case held that comparative fault is not applicable in a product's liability case, the majority opinion does leave the door open for the submission of the defense of contributory fault consistent with Missouri Approved Instruction (MAI) 32.23 in appropriate cases. *Id.* at 493. The majority opinion seems to support the proposition that where it may be found that the plaintiff assumed the risk, or voluntarily and unreasonably exposed himself to a known danger then such an instruction would be appropriate. *Id.* Consequently MAI 32.23, the affirmative defense instruction relative to contributory fault, is a complete defense to strict liability.

Since the *Lippard* decision in 1986, there have been no Missouri cases which have found that a plaintiff "voluntarily and unreasonably exposed himself to a known danger", and thereby permitted a submission under MAI 32.23. The question to be answered is just when does one expose himself to such a known danger. Our review has led to a comparison of the standard used for assumption of the risk with that for contributory fault. The standards set forth in *Lippard* seem very close to those required by the legal principle "assumption of risk."

We consult *Prosser & Keeton on Torts,* § 68 at 486–87 (5th ed. 1984):

*Knowledge and Appreciation of Risk*

The defense of assumption of risk is in fact quite narrowly confined and restricted by two or three elements or requirements: first, the plaintiff must know that the risk is present, and he must further understand its nature; and second, his choice to incur it must be free and voluntary.

'Knowledge of the risk is the watchword of assumption of risk.' Under ordinary circumstances the plaintiff will not be taken to assume any risk of either activities or conditions of which he has no knowledge. Moreover, he must not only know of the facts which create the danger, but he must comprehend and

appreciate the nature of the danger he confronts.

The Eight Circuit Court of appeals held in *Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322, 1331 (8th Cir.1985) that:

Missouri recognizes contributory fault as an affirmative defense to strict liability. To be charged with contributory fault, however, the plaintiff must know the facts which create the danger and comprehend and appreciate the danger itself. *Collins v. B.F. Goodrich Co.,* 558 F.2d 908, 911–12 (8th Cir.1977) (Missouri law); *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362, 364 (Mo. 1969) (tire rim case). There must be evidence that the danger is open and obvious and that plaintiff voluntarily and unreasonably encountered a known risk. *Haines v. Powermatic Houdaille Inc.,* 661 F.2d 94, 96 (8th Cir.1981). The plaintiff, however, need not know of the exact design defect but only of the risk to the user. *Ensor v. Hodgeson,* 615 S.W.2d 519, 525 (Mo.Ct.App.1981).

Here, we are dealing with the use of a silage wagon which used three sets of rotating steel knives to break up silage brought to the beaters by slats moving over a smooth floor. The silage might be tightly packed, wet or frozen, and it was the purpose of the rotating knives to break it up before it was moved out of the wagon and was used as feed to animals. Plaintiff knew exactly how the silage wagon operated as he had restored it to its use after it had been abandoned by a previous owner for ten years. He was an experienced farm worker who maintained and repaired his own machinery. Plaintiff's knowledge of this machinery was such that his counsel qualified him as an expert to testify to its operation at trial. He used this particular wagon almost every day for more than a month. He was aware that a PTO switch from his attached tractor supplied the power to all the moving parts of the GOV. Additionally, when he first noticed that the machine was not operating properly on the date of his accident, the first thing he did was to disengage the PTO before going

back and looking to find the cause of the problem.

After determining the cause of the problem to his satisfaction, he went back to the tractor, re-engaged the PTO and, knowing that the beaters were turning, climbed into the wagon and used a shovel to push silage under the moving beaters. Plaintiff was aware that once he engaged the PTO the beaters became operational. He was aware that the silage could have been pushed out of the back of the wagon and away from the moving beaters. Plaintiff acknowledged that he could have scooped the silage over the side, but stated, however, that those actions had not occurred to him on that particular day.

While plaintiff acknowledges that he knew that he could have been injured had he got an arm or leg caught in the beaters, he states that he did not recognize the risk resulting from having his clothes caught by the beaters as they rotated. Plaintiff's expert testified that had there been a sign on the wagon telling him what he already knew (that the beaters were dangerous), he would not have entered the wagon while they were in operation.

It is clear from the evidence that the plaintiff could not be shielded from the rotating blades by a guard of any sort because a guard would have prevented the silage from moving against the blades to be broken up before being sent out of the wagon on a conveyor. The plaintiff had not previously relied on anything to protect him from the beaters. He could have uncovered the suspected broken links while the PTO was disengaged but he chose to re-engage that PTO and shovel the silage directly into those beaters. Even after uncovering the area of the broken links, plaintiff continued to let the beaters rotate in front of him as he studied the broken parts, even though he testified that the lowest beater was some ten inches from the floor. Further, he stated that he was approximately one foot away from the beater. There was no explanation given or suggested as to how or at what level the coverall pant leg became entangled.

Plaintiff mistakenly relies on *Keener v. Dayton Electric Manufacturing Company,* 445 S.W.2d 362 (Mo.1969), in which the Court stated that Keener voluntarily exposed himself to a dangerous condition if he knew the pump he was using was defective. The Court pointed out that there was no evidence that the plaintiff knew the pump was not equipped with a ground wire or an overload protector. Keener had not been familiar with the pump prior to offering to assist a neighbor on the day of the accident. Therefore, the Court held that contributory fault was not applicable in this case.

However, in the case at bar the plaintiff was experienced and educated in the repair of farm equipment and rebuilt this particular piece of equipment making it operative. He was aware of its operation and the dangers of coming into contact with the beaters, and arguably, that is why he initially disengaged the power. However, he knowingly took a risk by re-engaging the power and trying to repair the broken chain. The plaintiff admits knowledge of the risk of physical damage to his body by contact with the beaters. Knowledge of such a danger is transferable to contact with his clothing. Such action on the part of plaintiff amounts to plaintiff voluntarily and unreasonably exposing himself to a known danger. Hence, the submission of MAI 32.23 was appropriate. While this was a tragic misfortune for the plaintiff, if ever there was a case where the submission of the defense of contributory fault was appropriate, this is it.

## II.

Plaintiff complains of the giving of a tail by the trial judge during the reading of the instructions to the jury. During the instruction conference, the court noted that a tail would be required in plaintiff's verdict director if instruction no. 18 was given at the request of defendant. After some discussion, the court stated that it would give instruction no. 18 with some modification. Thereafter, only a general objection was made by plaintiff to the giving of the instruction. The parties were

then responsible for having their tendered instructions prepared in final form.

In reading the instructions to the jury, the court noted that the tail had been left off instruction no. 16 and made note of it. The court added the same tail to instruction no. 17 without comment. Prior to argument, the court noted that the clerk was to see that instructions 16 and 17 were corrected before being handed to the jury for use during deliberation. Again, no objection or comment was made on behalf of plaintiff.

In *Colley v. Tipton*, 657 S.W.2d 268, 273 (Mo.App.1983), this Court noted that a motion for new trial may not be utilized for the purpose of raising objections that should have been made during the course of trial. The plaintiff here seeks to have this Court protect him from the failure of his counsel to properly type his tendered instructions. The trial court did nothing more than protect the plaintiff from his own error. This Court also noted in *Sherpy v. Bilyeu*, 608 S.W.2d 521, 523 (Mo.App. 1980), that the failure to make a timely objection results in a waiver of that objection unless the plain error rule is applicable. If plaintiff had any proper objection to make, he had the duty to make it at the time the situation arose or as soon thereafter as possible rather than waiting to include it in a motion for new trial. The plain error doctrine is not available to "revive issues already abandoned by selection of trial strategy or by oversight." *Id.* The rule is reserved for those situations where manifest injustice results. *Id.* In the case at bar, we find no manifest injustice and therefore the plain error rule is inapplicable.

### III.

■ Here, plaintiff complains about a juror leaving the jury room with the bailiff to seek medication. When the jury announced that it had reached a verdict, no record was made by counsel for plaintiff concerning the temporary absence of a juror from the jury room during deliberations. Nor did plaintiff's counsel make a record after the jury had been discharged but before recess. Although mention was made of the absence of a juror in plaintiff's motion for new trial, no affidavits or testimonies were offered in support of the claim of impropriety at the time the motion for new trial was argued. There must be evidence of improper influence or prejudicial error if the court is to overturn the verdict of a jury and the denial of a motion for new trial by the trial court. *See Sample v. Witt*, 712 S.W.2d 394, 398 (Mo.App.1986). While the plaintiff cites *State v. Cooper*, 648 S.W.2d 137 (Mo.App.1983) in support of his position that prejudicial error automatically results from such an occurrence, this Court in *Sample* pointed out that the *Cooper* decision was governed by a statute. *Sample*, 712 S.W.2d at 398.

### IV.

■ Here, plaintiff seems to argue that the testimony of his expert should have resulted in an automatic directed verdict in his favor. It is apparent that plaintiff believes that the testimony of John Sevart, who suggested that the steel knives of the beaters might have been made of something less aggressive and that the wagon might have had a few other added features which might have prevented entanglement in the beaters. However, Mr. Sevart's testimony, as any other witnesses's testimony, need not be accepted as the gospel by either the judge or the jury. The jury is entitled to weigh the testimony of the alleged expert and give it such weight as it deems appropriate. A directed verdict should be used sparingly particularly when it involves the party having the burden of proof. *See Rawlings v. Young*, 591 S.W.2d 34, 37 (Mo.App.1979); *see also State ex rel. State Highway Commission of Missouri v. Gebhardt*, 714 S.W.2d 558, 560 (Mo.App. 1986).

The judgment of the trial court is affirmed.

NUGENT, J., dissents in separate opinion.

NUGENT, dissenting.

I respectfully dissent.

Plaintiff Harper's injury occurred when his coverall pant's leg became entangled in the rotating beaters of the Grain–O–Vator silage wagon he was operating. The entanglement instantly twisted and tore his coveralls from his body, flipped him out of the wagon tearing off his right arm.

Judge Gaitan in his majority opinion correctly describes plaintiff as an experienced farmer who knew his farm machinery and its operation. He also notes that plaintiff admitted knowledge of the risk of physical injury to one who comes in contact with the beaters. Then the majority opinion leaps over the gap in the evidence between (1) knowledge that the beaters presented a risk to the farmer's body and limbs if they came in contact with the beaters and (2) knowledge that the beaters were a risk to the farmer's limbs if only his clothing became entangled in them. That leap is necessary to the majority's position because nothing in the evidence filled the gap. None of the evidence showed that plaintiff knew the risk, danger or likelihood of heaving his arm torn off if his pant's leg became entangled in the beaters. Without such evidence, plaintiff Harper is in exactly the same position plaintiff Keener was in in *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo.1969). All the knowledge in the world about the operation of the GOV simply does not establish that plaintiff knew he could lose his arm if his pant's leg came into contact with the beaters. Plaintiff's knowledge that his hand or foot, arm or leg would certainly be mangled if he allowed them to get into the machinery does not translate into knowledge of the risk to his arm in getting his pant's leg caught in the machinery. Plaintiff denied that he knew of that risk and no one adduced evidence to the contrary.

As Judge Gaitan points out, quoting Professors Prosser and Keeton, the defense of assumption of risk has knowledge of the risk as its watchword and first requirement. Unless, as Prosser and Keeton suggest, the evidence supports a finding that the plaintiff knew, comprehended and appreciated the danger he faced, the court may not submit the case to the jury on the defense theory of assumption of the risk.

Missouri Approved Instruction 32.23 submits plaintiff's assumption of the risk. Here the court gave MAI 32.23 in Instruction No. 18.

Accordingly, we should remand the case for a new trial.