Rex WILSON and Shirley Wilson,
Plaintiffs–Appellants,

v.

DANUSER MACHINE COMPANY,
INC., Defendant–Respondent.

Rex WILSON and Shirley Wilson,
Plaintiffs–Respondents,

v.

DANUSER MACHINE COMPANY,
INC., Defendant–Appellant.

Nos. 18652, 18645.

Missouri Court of Appeals,
Southern District,
Division One.

March 10, 1994.

Motion for Rehearing and Transfer to
Supreme Court Denied April 1, 1994.

Application to Transfer Denied
May 26, 1994.

Michael J. Patton, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for appellants-respondents Rex Wilson and Shirley Wilson.

Donald W. Vasos, Law Offices of Donald W. Vasos, Kansas City, for respondent-appellant Danuser Mach. Co., Inc.

MONTGOMERY, Judge.

This is a product liability case instituted by Plaintiffs, Rex and Shirley Wilson (hereinafter Rex or Shirley), against Defendant, Danuser Machine Company, Inc. (hereinafter Danuser). The suit arose out of Rex's use of a Model MS–1 log splitter manufactured by Danuser. While using the log splitter Rex suffered the loss of three fingers from his right hand. The case was submitted to a jury on a strict liability design defect theory. The jury returned a verdict assessing Rex's damage at $400,000 and Shirley's at $100,000. Fault was assessed at 57 percent to Rex and at 43 percent to Danuser. Both sides appeal. The consolidated appeals will be separately addressed.

On appeal, Rex claims the evidence failed to support the submission of the affirmative defense instruction of comparative fault because the evidence only established that Rex's conduct "was the product of an inadvertent reaction and was not voluntary." Danuser urges with equal vigor that Rex failed to prove that the log splitter was in a defective and unreasonably dangerous condition and that it failed to perform or malfunctioned. Danuser also alleges that the question of Rex's impaired future earnings was erroneously submitted to the jury. This Court affirms the judgment.

The facts of the accident can best be understood after a description of the log splitter involved and the method of its operation. At the time of the accident, Rex was using a Danuser made, Model MS–1 log splitter that belonged to a neighbor. Unlike some other log splitters, the Model MS–1 is built to attach to a three-point hitch on the back of a tractor that has the capacity to operate the log splitter's hydraulic-powered ram. This is accomplished by allowing the tractor motor to run, which furnishes power to operate the log splitter. Since the three-point hookup to the tractor is the only support for the log splitter, some of the tractor motor vibration is transmitted to the log splitter, which affects its stability.

The major parts of the MS–1 log splitter are a three-inch-wide log support beam, a hydraulic ram that forces the logs down the beam, and, at the end of the beam, a stationary wedge that splits the logs. The ram is activated by pushing down on a lever atop the ram casing, which moves the ram toward the wedge when the lever is pushed in that direction. The wedge is located at the end of the beam farthest from the tractor. The ram retracts into its casing when the lever is pulled up. Releasing the lever stops the ram wherever it is located on the beam.

Splitting a log is a simple operation. A log is laid on the beam. The operator pushes down on the lever, and the ram forces the log into the wedge, causing the log to split apart.

On the morning of the accident, Rex, his wife and their four children went to a neighbor's place to split wood located there. They used the neighbor's tractor, on which the subject log splitter was mounted. During the morning all of the family worked together splitting wood. That afternoon only Rex, his daughter Renea and his sons, Rex Wayne and Roy Dale, returned to split wood. They were splitting logs that varied in size from six inches to 16 inches in diameter. At the time of the accident, Rex was loading logs on the beam, Renea was carrying logs to Rex for loading, Roy Dale, age 7, was operating the ram-activating lever, and Rex Wayne was removing and stacking split logs as they fell from the beam. After placing a log on the beam, Rex would hold it with his hand if the log did not appear to balance. When the ram forced the log into the splitting wedge, securing the log in place, Rex would remove his hand. If the log appeared to balance,

instead of waiting for the ram to engage the log, Rex would speed up his work by removing his hand from the log and reaching for another one. Just prior to the accident, Rex loaded a log (six to eight inches in diameter) onto the beam, removed his hand from it, and reached for another log. Out of his peripheral vision he saw the log, just loaded, start to roll. Rex reached for the log and somehow placed his right hand between the moving log and the wedge. Instantly, his fingers were severed.

Rex testified that he was an experienced and professional woodcutter. He cut and split fire wood for sale and for his own use. He stated that he was a skilled operator of a chain saw and had used a log splitter he owned for two or three years before the accident. Prior to that, he had rented log splitters. He had previously used his neighbor's Danuser log splitter and was familiar with its operation. Rex had a total of seven years' experience in the operation of log splitters. He testified that he and his family "could run a [log] splitter just as fast as it could run depending on the cycle time." Rex agreed he knew before the accident there was an open and obvious danger of getting his hand caught between the log and the wedge when the log splitter was in operation. He admitted he knew that logs would not fall off the beam if they were held. He knew that if the logs were not held, one of two things would happen—they would either stay in place or move.

### PLAINTIFFS' APPEAL NO. 18652

■ The sole issue Rex raises on appeal is whether Danuser made a submissible case of comparative fault as submitted under Instruction No. 8. Our review of this point is governed by the following rule:

> In determining whether an instruction should have been given or withheld based on the evidence presented, the reviewing court views all the evidence in the light most favorable to the party offering the instruction giving that party the benefit of all favorable inferences and disregarding any evidence to the contrary.

*Roque v. Kaw Transport Co.,* 697 S.W.2d 254, 257 (Mo.App.1985). Measured by this standard, the evidence was sufficient to support the submission of the affirmative defense instruction. That instruction reads:

> In your verdict you must assess a percentage of fault to plaintiff, whether or not defendant was partly at fault, if you believe:
>
> First, when the log splitter was used, plaintiff knew of the danger as submitted in Instruction No. 6 and appreciated the danger of its use, and
>
> Second, plaintiff voluntarily and unreasonably exposed himself to such danger, and
>
> Third, such conduct directly caused or directly contributed to cause any damage plaintiff may have sustained.

■ We agree with Rex that each element of the proffered instruction must have an evidentiary basis. *Fitch v. J.A. Tobin Constr. Co., Inc.,* 829 S.W.2d 497, 504 (Mo. App.1992). Rex quarrels only with the lack of evidentiary support for paragraph Second of the instruction. He succinctly states there was no evidence that he voluntarily and unreasonably exposed himself to the dangers of the log splitter. He reasons that the evidence shows only that his exposure to the danger was a product of an "instinctive response or reaction." Therefore, he concludes, his actions were "involuntary, inadvertent, unintentional, and were not the product of a conscious decision."

Clearly, Rex's argument focuses only on his movements at the exact time the log started to roll, and he finds no significance in the evidence of his prior conduct and experience. His argument centers on the voluntariness of his reaction to the falling log without regard to the choices Rex earlier made in operating the log splitter. In view of all the evidence presented, we believe his focus is too narrow.

After the Supreme Court's decision in *Lippard v. Houdaille Industries, Inc.,* 715 S.W.2d 491 (Mo. banc 1986), the legislature enacted § 537.765, RSMo Supp.1993, which became effective July 1, 1987. In relevant part, the statute provides:

> 1. Contributory fault, as a complete bar to plaintiff's recovery in a products

liability claim, is abolished. The doctrine of pure comparative fault shall apply to products liability claims as provided in this section.

2. Defendant may plead and prove the fault of the plaintiff as an affirmative defense. Any fault chargeable to the plaintiff shall diminish proportionately the amount awarded as compensatory damages but shall not bar recovery.

3. For purposes of this section, "fault" is limited to:

. . . .

(3) Use of the product with knowledge of a danger involved in such use with reasonable appreciation of the consequences and the voluntary and unreasonable exposure to said danger[.]

The comparative fault instruction at issue in this case is based on MAI 32.23 [1978 Revision], as modified by MAI 37.02 [1986]. As Rex's argument makes clear, the affirmative defense that Missouri courts once called contributory fault (MAI 32.23) in product liability cases changed somewhat after the enactment of § 537.765 and is now called comparative fault (MAI 37.02). The elements of the defense have not changed, however. Therefore, discussions of contributory fault in past cases are relevant to our consideration of comparative fault in this case.

In *Arnold v. Ingersoll–Rand Co.*, 834 S.W.2d 192, 195 (Mo. banc 1992), our Supreme Court said the fact that a plaintiff exposed himself to a danger is not sufficient to submit an instruction under MAI 32.23. "It must be the danger submitted in the plaintiff's instructions." *Id.*

Here, the danger submitted in Instruction No. 6 was that the log splitter was defectively designed because the narrow beam allowed logs to roll, which "invited sudden reactions and inadvertent contact with the dangerous parts of the log splitter." The question becomes whether there was sufficient evidence that Rex voluntarily and unreasonably exposed himself to this danger.

The word "voluntary" is defined in Webster's Ninth New Collegiate Dictionary (1983) as "proceeding from the will or from one's own choice or consent." The choices Rex made that led to his injury resulted from years of experience with log splitters, including the specific log splitter involved. Rex knew that some logs balanced and that some would fall unless held (presumably because of the narrow beam). He admittedly knew of the danger of getting his hand caught between the log and the wedge. From the evidence, the jury could infer (1) that Rex knew the tractor motor vibrations could cause even greater lack of stability of the log unless held on the beam; (2) that since Rex knew some logs would fall unless held, he also knew he might instinctively react to a falling log, trying to stabilize it; and (3) that Rex knew that no danger of the type that occurred would exist if he held the log on the beam.[1] Yet, the evidence reveals that, to speed up his work, Rex chose voluntarily to remove his hand from the log in question, knowing it would either stay in place or fall. His other choice (holding the log) was obviously safer. Therefore, his exposure to the danger arose when he voluntarily removed his hand from the log, not when he reacted to the falling log.

In deciding the propriety of a contributory fault submission, the general tendency of Missouri appellate courts "is a case-by-case approach based on the *plaintiff's experience*." *Arnold*, 834 S.W.2d at 196 (emphasis added). One such case, mentioned in *Arnold*, is *Harper v. NAMCO, Inc.*, 765 S.W.2d 634 (Mo.App.1989), in which a contributory fault submission under MAI 32.23 was upheld.

In *Harper*, plaintiff was injured while operating a silage wagon which he had previously rebuilt. He was an experienced farm worker and was experienced in maintenance and repair of machinery. His knowledge of the silage wagon qualified him to testify as an expert on its operation. To investigate a

---

1. We believe these are reasonable inferences in light of the facts in *Arnold,* from which the Supreme Court concluded that a rational jury could reasonably infer (1) that plaintiff knew of the danger posed by a non-explosion-proof electrical product and (2) that plaintiff therefore knew the danger of allowing gas fumes to accumulate in the presence of an air compressor. 834 S.W.2d at 196.

malfunction, plaintiff climbed into the wagon and, while standing near the beaters, felt a tug on his right coverall leg. As he attempted to free himself, he "braced" his hand across the top of the beaters that chopped the silage. In doing so, his right arm was severed.

Contrary to Rex's assertion, *Harper* did involve the issue of plaintiff's voluntary exposure to a known danger. The Court said, "Since the *Lippard* decision in 1986, there have been no Missouri cases which have found that a plaintiff 'voluntarily and unreasonably exposed himself to a known danger,' and thereby permitted a submission under MAI 32.23. The question to be answered is just when does one expose himself to such a known danger." *Harper,* 765 S.W.2d at 637.

As Danuser points out, the *Harper* court's holding was based, primarily, on four facts: 1) plaintiff was experienced in operating the machine; 2) he was aware that the beaters were moving when he got onto the wagon; 3) he admitted knowing the risk of physical harm if he came in contact with the beaters; and 4) he knew there was an alternative course of action—pushing the stuck silage out of the side or back of the wagon rather than through the beaters. Similarly, in this case Rex (1) was experienced in using this log splitter and others; (2) knew that, while the ram was moving, a log could fall unless held, and by inference (because of his experience) knew that he was likely to react to that movement; (3) knew the risk of physical harm from getting his hand caught between the wedge and a log; and (4) knew there was at least one safe alternative—keeping his hand on the log until it was secured between the ram and wedge.

The reaction Rex made in reaching for the log is almost identical to plaintiff Harper's reaction of bracing his hand on the beater while attempting to free his coveralls. In both cases, the emergency was one created by the plaintiff, when a safe alternative existed. The strong factual similarities between *Harper* and the instant case persuade us that

the submission of the comparative fault instruction was proper.

Rex bases his well-written argument on the holdings in *Coty v. U.S. Slicing Mach. Co., Inc.,* 58 Ill.App.3d 237, 15 Ill.Dec. 687, 373 N.E.2d 1371 (1978); *Elder v. Crawley Book Mach. Co.,* 441 F.2d 771 (3d Cir.1971); *Scott v. Dreis & Krump Mfg. Co.,* 26 Ill. App.3d 971, 326 N.E.2d 74 (1975); and *Mc-Adams v. Pak–Mor Mfg. Co.,* 602 S.W.2d 374 (Tex.App.1980). These cases stand for the proposition that submission of an assumption of risk defense is improper in a strict liability case absent evidence of plaintiff's voluntary exposure to the danger. In these cases the evidence was only sufficient to show plaintiff's injury resulted from his or her inadvertent or instinctive reaction in the operation of the machine involved. We find these cases unpersuasive for at least two reasons.[2] First, in none of the cases did the evidence show that the plaintiff (with full knowledge of the danger) could have operated the machine in a safe manner but chose to operate it in an unsafe manner. Second, as the Western District stated in *Harper,* 765 S.W.2d at 637, and this Court stated in *Strang v. Deere & Co.,* 796 S.W.2d 908, 915–16 (Mo.App.1990), the standards for submitting a contributory (now comparative) fault instruction are "very close" to the standards required by the legal principle "assumption of risk." Both courts cited a discussion of the assumption of risk elements found in W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 68, at 486–87 (5th ed. 1984). In that discussion, the authors state that since ordinarily "there is no conclusive evidence against the plaintiff on these issues [i.e., the issues of plaintiff's knowledge and understanding of the risk and plaintiff's voluntary choice to incur it], they are normally for the jury to decide." *Id.* at 487. Here, the jury was properly allowed to decide these issues.

For the reasons discussed, we hold the evidence supported the submission of Instruction No. 8. Rex's point is denied.

**2.** A third reason for finding Rex's cited cases unpersuasive is that cases from other jurisdictions relating to strict liability and comparative fault have limited value for deciding cases in Missouri because each state's decisions are influenced by its own particular statutes or common law. *Lippard,* 715 S.W.2d at 493 n. 2.

*DEFENDANT'S APPEAL NO. 18645*

Danuser's first point alleges the trial court erred in denying its motion for directed verdict because "plaintiffs failed to prove that the log splitter was in a defective and unreasonably dangerous condition and that it failed to perform or malfunctioned." Danuser's motion for judgment n.o.v. alleged that the trial court should have determined as a matter of law that the log splitter was not defective and unreasonably dangerous when sold.

A motion for judgment n.o.v. presents the same issues as a motion for directed verdict at the close of all the evidence, i.e., whether plaintiff made a submissible case. *Wells v. Orthwein,* 670 S.W.2d 529, 532 (Mo. App.1984). In deciding the submissibility of plaintiff's case and whether the trial court erred in denying a motion for directed verdict at the close of the evidence, the appellate court reviews the evidence from a viewpoint most favorable to plaintiff and gives plaintiff the benefit of every reasonable inference that the evidence tends to support and disregards defendant's evidence that does not support the plaintiff's case. *Rauh v. Interco, Inc.,* 702 S.W.2d 497, 499 (Mo.App.1985).

So viewed, Rex's expert witness, Dr. Virgil Flanigan, testified that the log splitter in question was defectively designed and unreasonably dangerous because the narrow log support beam did not prevent logs from rolling or falling off. He testified that a falling log is hazardous because it can fall and strike the operator. Dr. Flanigan said a design that prevents this hazard would also prevent an operator's inadvertent reaction to log movement because the operator would know that the log would not fall and injure him. The expert opined that Danuser could have remedied this defect by using a wider beam, by adding a log support on each side of the beam, or by designing a trough into the beam.

Danuser offered expert witness testimony from John Rex, the vice president of manufacturing for Danuser, and Bolter Kelsey. These experts agreed with Dr. Flanigan that the obviousness of a hazard is no excuse for not eliminating or guarding against it, if practical to do so.

John Rex also testified that some logs will balance on the Danuser log splitter beam and others will not. He agreed that some operators could balance a log on the beam and reach for the next log. He viewed that procedure as being neither safe nor unsafe. Finally, he agreed that an operator would react in some way if a log started to roll off on his foot while the operator was reaching for another log. He suggested that one such reaction might be just to "get out of the way."

Dr. Flanigan further testified that engineers know that people react to sudden events and should take human reaction and distraction into account in designing machine safety features. His testimony implied that engineers should avoid machine designs that invite sudden movements near unguarded machine components. Finally, Dr. Flanigan said the hazard inherent in the Danuser log splitter was easily remedied by use of a proper design. He believed a proper design would have prevented Rex's injury.

From this evidence, Danuser tersely argues that under Missouri law, "plaintiffs' failure to present evidence that the log splitter failed or malfunction[ed] is fatal to their claim." We disagree.

The law in Missouri is well established that strict liability in tort does apply to defective design cases. *Blevins v. Cushman Motors,* 551 S.W.2d 602, 606 (Mo. banc 1977). Noting that the concept of strict liability in tort, as stated in 2 Restatement (Second) of Torts § 402A, had been recognized in *Keener v. Dayton Elec. Mfg. Co.,* 445 S.W.2d 362, 364 (Mo.1969), the *Blevins* court said:

> In *Keener,* this Court established that an action sounding in strict liability in tort may lie to recover for injuries caused by a product which is unreasonably dangerous *as manufactured.* It is only logical that in this case we permit an action in strict tort liability to obtain for the recovery for injuries caused by a product which is unreasonably dangerous *as designed* because,
>
> "[T]here is no rational distinction between design and manufacture in this context, since a product may be equally defective and dangerous if its design

subjects protected persons to unreasonable risks as if its manufacture does so." *Pike v. Frank G. Hough Co.*, 2 Cal.3d 465, 85 Cal.Rptr. 629, 636, 467 P.2d 229, 236 (banc 1970).

*Id.* at 607.

Continuing, the court said:

We affirm that a product may be found to be in a "defective condition *unreasonably dangerous* to the user or consumer or to his property," and, therefore, actionable under § 402A, when the product is found to be "defective and dangerous when put to a use reasonably anticipated" by the manufacturer. *Keener*, supra, 445 S.W.2d at 366.

*Id.*

Again, in *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. banc 1986), the Supreme Court reaffirmed its holding in *Blevins*. The Court stated:

The core concern in strict tort liability law is safety. *See* Comments a through i to Section 402A. Therefore, the primary inquiry in a design defect case is whether the product—because of the way it is designed—creates an unreasonable risk of danger to the consumer or user when put to normal use. To establish liability in a design defect case, the plaintiff bears the burden of demonstrating that the product, as designed, is unreasonably dangerous and therefore "defective", and that the demonstrated defect caused his injuries. Though obviously abbreviated, the foregoing explanation describes the heart and soul of a strict tort liability design defect case—unreasonable danger and causation.

*Id.* at 375–76 (citation omitted).

The "heart and soul" of Plaintiffs' evidence indicated that a defective design allowed logs to roll, thereby inviting human reaction; that the normal use of the log splitter, as designed, allowed this log movement to occur, hence creating an unreasonable risk of danger; and that a safer design would have reduced or eliminated log movement, thus removing the possibility of an operator inadvertently reacting to such movement. In addition, the testimony clearly demonstrated that the defect caused or contributed to the cause of Rex's injury. We view the evidence as sufficient to make a submissible case under *Blevins* and *Nesselrode*. Under these cases, Rex had no burden to establish product failure or malfunction. He met his required burden by showing that the log splitter, as designed, was unreasonably dangerous and therefore "defective."

Danuser mainly relies on *Richardson v. Holland*, 741 S.W.2d 751 (Mo.App.1987), and *Linegar v. Armour of America, Inc.*, 909 F.2d 1150 (8th Cir.1990), to support its argument that Rex was required to show that the log splitter failed or malfunctioned.

In *Richardson*, this Court decided that the trial court properly dismissed a petition that alleged the manufacturer of a pistol was liable because the pistol involved "was defective and unreasonably dangerous in that it belongs to a class of guns commonly referred to as 'Saturday Night Specials.'" 741 S.W.2d at 753. (The plaintiff was shot by a defendant who used a Saturday Night Special.) However, the petition in that case included no allegation that a defect in manufacturing or design had caused the pistol to malfunction. Thus, because the plaintiff failed to allege a product defect, *Richardson* was not a defective design case. The thrust of our decision was that § 402A imposes strict liability only when there is "some thing wrong" with the product that causes the harm. The "some thing wrong" that was missing in *Richardson* is present in the evidence Rex offered. He showed the existence of a specific design defect—a narrow beam that allowed log movement, thereby inviting sudden operator reaction. *Richardson* provides no support to Danuser.

*Linegar* involved a product liability claim against the manufacturer of a bullet-proof vest by the family of a slain Missouri state trooper. There, the Eighth Circuit Court of Appeals reversed a jury verdict in favor of the family. The plaintiffs claimed the vest was defectively designed because the front and back panels did not meet at each side of the wearer's body. The fatal bullet entered the trooper's body in the unprotected area. Applying Missouri substantive law, the court concluded, as a matter of law, that the vest was not defective and unreasonably danger-

ous. The court said, "Under the Missouri law of strict liability in tort for defective design, before a plaintiff can recover from the seller or manufacturer he must show that 'the design renders the product unreasonably dangerous.' *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 377 (Mo.1986) (en banc). Ordinarily, that will be a jury question...." *Linegar,* 909 F.2d at 1153. Finding no evidence that the vest's design made it unreasonably dangerous, the court said that it defies logic to suggest that the manufacturer "reasonably should have anticipated that anyone would wear its vest for protection of areas of the body that the vest obviously did not cover." *Id.*

Here, Rex's evidence does show that a design defect caused the log splitter to be unreasonably dangerous and does show that Danuser reasonably should have anticipated that the narrow beam could allow log movement, thereby inviting sudden reaction by the operator. As noted in *Linegar,* such evidence creates a jury question.

■ A product is defectively designed if it "creates an unreasonable risk of danger to the consumer or user when put to normal use." *Nesselrode,* 707 S.W.2d at 375. The concept of unreasonable danger, which determines whether a product is defective, is presented to the jury as an ultimate issue without definition. MAI 25.04 [1978 Revision]. "The jury gives this concept content by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties." *Nesselrode* at 378.

Viewing the evidence as we must, Rex's evidence was sufficient to create a jury question based on the above standards. Point I is denied.

■ Danuser's only other point reads:

The trial court erred in submitting the question of impaired future earning capacity to the jury.

Rule 84.04(d) provides:

Points Relied On. The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous....

 The purpose of Rule 84.04(d) and the necessity of obeying it are thoroughly discussed in *Thummel v. King,* 570 S.W.2d 679, 684–87 (Mo. banc 1978). Three things are required with respect to a point relied on: (1) a statement of the action or ruling complained of; (2) a statement that specifies why the ruling was erroneous; and (3) a statement informing the appellate court wherein the evidence (or lack of it) supports the position the party asserts the trial court should have taken. *Carrier v. City of Springfield,* 852 S.W.2d 196, 198 (Mo.App. 1993). Here, the point does not specify wherein and why the trial court erred. An insufficient point relied on preserves nothing for this court's review. *Bentlage v. Springgate,* 793 S.W.2d 228, 231 (Mo.App.1990). This point is, therefore, denied.

The judgment is affirmed.

PARRISH, C.J., and SHRUM, J., concur.