Clive STRANG, Plaintiff–Appellant,

v.

DEERE & COMPANY and Huff Equipment Company, Defendants–Respondents.

No. 16592.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 9, 1990.

 

William W. Francis, Jr., Placzek & Francis, Springfield, Robert E. Salmon, Meagher & Geer, Minneapolis, Minn., Laurence M. Kelly, Montrose, Pa., for plaintiff-appellant.

B.H. Clampett, Gary R. Cunningham, Michael J. Cordonnier, Daniel, Clampett, Lilley, Dalton, Powell & Cunningham, Springfield for defendant-respondent Deere & Co.

Martin M. Loring, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for defendant-respondent Huff Equipment Co.

SHRUM, Judge.

■ This is a products liability case. Plaintiff sued for injuries he sustained

when a model JD–300 Loader/Backhoe manufactured by defendant Deere and Company (hereafter Deere) tipped over, pinning plaintiff to the ground. Defendant Huff Equipment Company (hereafter Huff) sold the JD–300 to plaintiff's employer in 1981. Plaintiff's principal claim was that the JD–300 was in a defective condition, unreasonably dangerous when put to a reasonably anticipated use because it was not equipped with a rollover protection system (hereafter ROPS). The trial court submitted to the jury the MAI 32.23 affirmative defense instruction on contributory fault. The jury's verdict was for defendants. Plaintiff appeals from the judgment entered for defendants by the trial court on the jury verdict.[1] This court affirms.

In the summer of 1983, underground cable was being laid along the east side of county road R–26, south of Stilson, Iowa. Initially, the cable was installed with the use of a large circular plow that dug a 4–foot deep furrow or "rip line" into which the cable was laid. The rip line was located on the shoulder of the county road, approximately 18 inches from the road. Plaintiff's employer, Push, Inc., was a subcontractor on the job. Push's job was to cleanup "flagged areas." Cleanup in flagged areas means to lower cable to proper depth where the plow had encountered rock, splicing cable, digging cable into transformer or splicer boxes, and back blade work. On September 13, 1983, plaintiff, while working for Push, Inc., was using a JD–300 Loader/Backhoe to perform the cleanup work. The model JD–300 Loader/Backhoe had been manufactured and sold by Deere in 1969. The JD–300 being used consisted of a utility-type tractor with a seat facing forward; a front loader/bucket; and a rear backhoe with boom, bucket and separate rear facing seat. The backhoe was equipped with stabilizers, also called outriggers, which extend from each side of the tractor that, when placed on the ground, lift the rear wheels off the ground and provide stability when using the backhoe. When operating the backhoe attachment, the operator sits in the rear facing seat and controls the backhoe bucket and attached boom with "waddle sticks."

No ROPS[2] was on the JD–300 when Huff sold it to Push, Inc., in 1981. Plaintiff was present when the president of Push, Inc., bought the JD–300 in question. The intended use of the JD–300 by Push, Inc., was explained to Huff but the availability of a ROPS retrofit package was not discussed. Plaintiff first worked for Push in 1973 and first operated a model JD–300 backhoe in 1978.

On September 13, 1983 (accident date), plaintiff was doing cleanup work using the JD–300 purchased from Huff. Plaintiff straddled the "rip line" with the JD–300; that is, he positioned the tractor on the east side of the county road, facing south, with the backhoe boom to the north. At the

---

1. Deere urges in its brief (without filing a motion to dismiss) that no appeal is pending because plaintiff has appealed from the trial court's order overruling his post-trial motions, rather than appealing from the trial court's judgment. "However where the violation of Rule 81.08(a) has not resulted in a dismissal of the appeal and where appellant has made an effort in good faith to present cognizable issues, discernable from the briefs and record, this inadequacy has frequently been excused." *Ridley v. Newsome,* 754 S.W.2d 912, 914 (Mo.App. 1988). If the roles were reversed, this court feels certain Deere and Huff would want the doctrine of leniency applied. The briefs clearly present all points for all parties. No party's rights have been prejudiced or adversely affected by alleged violation of Rule 81.08(a). An examination of the issues will be made as if the appeal was properly taken from the final judgment.

2. In 1969, roll bars were not standard equipment on the model JD–300. A ROPS is a safety device placed on off-road vehicles in anticipation of accidents for the purpose of preventing injury. Since rollover cannot be prevented through design methods, a ROPS minimizes or prevents personal injury. The principal purpose of a ROPS is to limit the roll to approximately 90 degrees. A ROPS also absorbs energy and keeps the machine off of the operator in the event of a rollover. A ROPS consists of a two-post structure that is tied together with a crosspiece located above the operator's head.

site, county road R–26 was a two-lane concrete, north-south road, with a shoulder approximately 4 foot wide. The roadbed (pavement and shoulders) was approximately 10–15 feet above the surrounding grade and the slope was described as "quite steep." While digging with the backhoe, plaintiff got stuck; he was trying to dig out rocks and the back end of the JD–300 "slid down a little bit." The tire furthest up the slope came to rest in the plow rip. At that point, plaintiff was in the backhoe seat, facing north (facing the backhoe, facing the rear of the tractor). He moved from the "backhoe seat" to the tractor seat intending to try to drive the tractor out of the plow rip. He raised the stabilizers in order to get the wheels back on the ground, raised the front loader, moved the backhoe boom toward the road side and tried to drive the equipment out of the "plow rip." He found he could not drive out because the positive traction[3] was not working and the tire in the plow rip continued to spin. At that time there were persons who worked as splicers and elbowers working and going up and down the road. Plaintiff was the only employee of Push, Inc., on the job. There were, however, other backhoe operators working, one of whom said that the backhoes were "pretty close together right then.... You could see one another." In his employment, plaintiff had been stuck before but had never gotten into trouble with his employer because of it or for having to get assistance to get out. Plaintiff admitted that his getting the JD–300 stuck was not something his employer would have penalized him for.

After unsuccessfully trying to drive out, plaintiff tried other maneuvers to get the tractor unstuck. He got back on the rear seat (facing the backhoe, facing north, facing the rear of the tractor), put the stabilizers down, put the backhoe bucket down in the trench that he had been digging, and tried to push the JD–300 out of the ditch with the backhoe boom. He raised the stabilizers slightly as he started the pushing action, but this failed to extricate the JD–300. Plaintiff then used the backhoe attachment and the front bucket loader in conjunction to try to move the equipment forward out of the ditch. That too failed. Plaintiff continued his efforts to move the JD–300. He swung the backhoe boom and bucket downhill into the road ditch (as opposed to the ditch he had been digging). The stabilizers were still down, but plaintiff acknowledged that he knew: (a) that he was shifting the weight downhill; (b) that was going to increase the instability of the tractor; and (c) the tractor was more prone to roll if the weight was going downhill. Plaintiff then tried to push the back end of the JD–300 out of the plow rip so he could drive out again. After swinging the backhoe boom and bucket downhill, he tried to pick up the backhoe boom and the tractor started to "tip a little.... Started to roll." He placed the boom back on the ground and then lifted the boom more slowly; it started to tip again. At this point, plaintiff had the JD–300 on the side of a slope with the boom downhill, it had tipped twice, but he was able to keep it from rolling by having the boom serve as a brace. Plaintiff then used the backhoe boom and bucket to pull the JD–300 sideways, downhill at an angle, so he could back straight into the road ditch. Plaintiff had raised the stabilizers off the ground. The front end loader had been a foot off the ground at the time. Plaintiff was using the boom and backhoe bucket downhill trying to pull and turn the JD–300. He did pull it down so that both back wheels were on the slope, and in the process rolled the JD–300 over.

Plaintiff tried unsuccessfully to jump off the high side first but all he could do was jump as far out as possible into the ditch. The tractor came down and one of the stabilizers struck plaintiff, pinning him to the ground. Plaintiff was unable to get free until David Hartwig, another backhoe

---

**3.** Positive traction on the JD–300 was described as a manually operated lever which locked both drive wheels so that, if one wheel is spinning, engaging the lever locks the differential together so that both wheels will turn at the same time.

operator, arrived within 5–10 minutes. With the use of Hartwig's equipment, he was able to free plaintiff. Upon arrival, Hartwig found the JD–300 on its side (the driver's left side if driver was looking to the front of the tractor, toward the loader/bucket). Hartwig drove his backhoe down into the ditch. He then positioned his backhoe to the side of plaintiff's backhoe that had the seat, the side facing the field. He then used the backhoe boom on the Hartwig tractor to push on the upper rear tire of plaintiff's JD–300 sufficiently to release plaintiff's hand from where it was pinned by the stabilizer.

On the date of the accident, plaintiff knew backhoe tractors could roll and that this JD–300 did not have a roll bar. The maneuver being used by plaintiff at the time of his accident had been used by plaintiff previously without any trouble and he did not think he was in any danger. Plaintiff testified that he had no idea that operating a tractor without a ROPS was dangerous and it had never previously made any difference to him whether a tractor had a ROPS or not. On cross-examination, plaintiff acknowledged that on the day of the accident he knew: (a) if a tractor rolled on top of him it would injure or kill him; (b) the boom on his tractor was downhill; (c) the center of gravity had shifted on the JD–300 at the time he tried to pull the rear of the tractor downhill; (d) the stabilizers were off the ground; (e) that the stabilizers off the ground did not offer any stability to the tractor; (f) the tractor tires were on the ground; (g) he was pulling the tractor laterally to those tires; and (h) the tractor had tipped up twice prior to this accident. In deposition, plaintiff acknowledged he knew, before the accident, the theoretical protection that roll bars provided for equipment.

Plaintiff's expert witness opined that a rollover protection structure was necessary to make a backhoe safe for its intended use; that a tractor such as the JD–300 without ROPS was not reasonably crashworthy but would be more crashworthy

with ROPS; and, that it was feasible to install ROPS into this JD–300 backhoe when manufactured in 1969 and when sold by Huff in 1981. He testified that in his opinion the JD–300 was unreasonably dangerous when built and sold in 1969 without ROPS. It was the expert's further opinion that if the JD–300 had been equipped with a ROPS, plaintiff would not have sustained the severe injuries which did occur.

Regarding the accident scene, it was his opinion that the JD–300 rolled 12–16 feet down the slope, and in terms of degrees, rolled more than 180 degrees and less than 270 degrees. Had a ROPS been in place, the JD–300 would have rolled more than 90 degrees but less than 110–120 degrees because the roll bar would have limited it from going further. Plaintiff's expert acknowledged that the maximum benefit of a roll bar is to contain the roll of the machine to approximately 90 degrees; accordingly, if a backhoe without a roll bar tips over and only rolled 90 degrees, the presence of a roll bar would not make any difference in the movement of the machine. He also acknowledged that (a) if the machine rolled 180 degrees (as he postulated) it would have been on its top, or (b) if it rolled 270 degrees (as he had suggested as the upper limit of roll) it would have ended up with the driver's seat pointed toward the county road rather than pointed toward the ditch or field (as described by Hartwig); and (c) if the JD–300 only rolled 90 degrees plus the degree of the slope, the left side of the machine would be on the ground (as Hartwig described he found it). Defendants offered no expert testimony.

■■■ In plaintiff's first point, plaintiff argues trial court error in not granting him a judgment notwithstanding the verdict because he contends the evidence showed, as a matter of law, that the JD–300 was defective and unreasonably dangerous when put to a reasonably anticipated use and that there was no competent evidence of contributory fault on the part of plaintiff. Plaintiff's contention is that because defendants presented no expert testimony, they

have conceded that the JD–300, without a ROPS, was not crashworthy; thus, defective as a matter of law. Plaintiff concedes that he had the burden of proving that the lack of a rollover protective structure was the cause of his injury.[4] Ordinarily, a court is not justified in directing a verdict in favor of the party having the burden of proof when the evidence relied on consists of oral testimony. *Price v. Bangert Brothers Road Builders, Inc.*, 490 S.W.2d 53, 57 (Mo.1973); *Crain v. Webster Elec. Cooperative*, 568 S.W.2d 781, 787 (Mo.App.1978). "Only in cases where the defendant in his pleadings or by his counsel in open court admits or by his own evidence establishes plaintiff's claim or where there is no real dispute of the basic facts and the facts are supported by uncontradicted testimony have the courts indicated there may be an exception to the general rule." *State ex rel. State Highway Com'n v. Gebhardt*, 714 S.W.2d 558, 560–61 (Mo.App.1986). Certainly, here, defendants did not admit in any way that the JD–300 was defective or that the alleged defect caused plaintiff's injuries. Plaintiff's contention in Point I is probably best answered by *Harper v. Namco, Inc.*, 765 S.W.2d 634 (Mo.App. 1989), a product case in which the same expert was involved as was involved in this case.

Here, plaintiff seems to argue that the testimony of his expert should have resulted in an automatic directed verdict in his favor. It is apparent that plaintiff believes that the testimony of John Sevart, who suggested that the steel knives of the beaters might have been made of something less aggressive and that the wagon might have had a few other added features which might have prevented entanglement in the beaters. However, Mr. Sevart's testimony, as any other witnesses's testimony, need not be accepted as the gospel by either the judge or the jury. The jury is entitled to weigh the testimony of the alleged expert and give it such weight as it deems appropriate. *Harper v. Namco, supra*, at 639.

An expert witness' opinion, while in the nature of a conclusion of fact, cannot be invoked to establish the facts. *Butcher v. Main*, 426 S.W.2d 356, 359 (Mo.1968); *Holtgrave v. Hoffman*, 716 S.W.2d 332, 335 (Mo.App.1986). In this case, the jury could have found that expert witness Sevart's investigation was not thorough or that his conclusions were not reasonable and believable. *Travelers Indemn. Co. v. Woods*, 663 S.W.2d 392, 397 (Mo.App.1983). No reasons are found that would justify variance from the general rule that directed verdicts (or judgments notwithstanding the verdict) should not be granted in favor of the party having the burden of proof when the evidence relied on is oral testimony. Plaintiff was not entitled to a judgment notwithstanding the verdict as against either defendant on the issue of liability.

■ Plaintiff further argues he should be entitled to a judgment notwithstanding the verdict, because the evidence left a "clear and reasonable inference that a backhoe without ROPS is defective...." That argument ignores the fact that automatic judgment for plaintiff was not mandated even if the jury could have made such inference. Judgment notwithstanding the verdict is a drastic action and should only be granted where the minds of reasonable persons would not differ as to the outcome of the case. *Roberts v. Menorah Medical Center*, 777 S.W.2d 330, 331 (Mo. App.1989); *Marti v. Economy Fire & Cas. Co.*, 761 S.W.2d 254, 255–56 (Mo.App.1988).

■ In this case, Deere and Huff vigorously contested the issue of causation, claiming the position in which Hartwig found the JD–300 demonstrated that it had only rolled 90 degrees plus the angle of the slope. Plaintiff's expert agreed that the principal purpose of the ROPS was to limit the roll of the equipment to 90 degrees; and if, indeed, it had only rolled 90 degrees plus the angle of the slope, the presence of a roll bar would not have made any difference in the movement of the machine. This jury, as in all cases, was entitled to draw

---

4. From page 8 of plaintiff's reply brief: "Without a doubt, it is the burden of plaintiff to show that the lack of roll-over protective structure was a substantial cause of the injury."

inferences from the operative facts it chose to find. *Guevara v. Friedeman,* 732 S.W.2d 259, 260 (Mo.App.1987). Even if the jury determined the JD–300 was defective, the final location of the machine, as described by Hartwig, would have allowed the jury to draw the inference that the JD–300 only turned 90 degrees plus the angle of the slope. If that inference was drawn, the jury may well have concluded that the lack of ROPS did not cause plaintiff's injury based upon the evidence from plaintiff's expert. The evidence in this case is such that reasonable and honest men could differ on the correct disposition of the case. *Love v. Deere & Co.,* 720 S.W.2d 786, 789 (Mo.App.1986). Plaintiff's Point I is denied.

■ In Point II(A), plaintiff claims there was insufficient evidence to support a contributory fault defense because the evidence established, as a matter of law, the plaintiff did not know and appreciate the danger complained of and did not voluntarily and unreasonably expose himself to such danger. The contributory fault instruction (MAI 32.23) was submitted to the jury at the request of Deere and Huff. "Contributory fault" is a defense to strict liability in Missouri (contributory negligence is not a defense to strict liability). *Keener v. Dayton Electric Manufacturing Company,* 445 S.W.2d 362, 365 (Mo.1969), states:

> The "defense [contributory fault] which consists of voluntarily and unreasonably encountering a known danger * * * will, in general, relieve the defendant of strict liability." Prosser, The Law of Torts, 3rd Ed., § 78, p. 539. Cf. *Goetz v. Hydraulic Press Brick Co.,* 320

Mo. 586, 9 S.W.2d 606, 60 A.L.R. 1064. The Restatement position is that if the user "discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery." 2 Restatement, supra, § 402A, p. 356. In 3 Restatement, Law of Torts, First, § 524, this defense is referred to as "contributory fault."

Subsequently, the Missouri Supreme Court held that comparative fault principles do not apply in a strict liability case and that plaintiff's negligence may neither defeat nor diminish recovery. *Lippard v. Houdaille Industries, Inc.,* 715 S.W.2d 491, 493 (Mo.banc 1986). However, "contributory fault" remained available as a defense. *Lippard,* at 493.[5] The question which remains is, "What is an appropriate case for the giving of MAI 32.23?" Specifically, did the facts here indicate this was an appropriate case for the giving of MAI 32.23?

The reported cases in Missouri are limited in number where the giving of an instruction on contributory fault (MAI 32.23) was approved.[6] The giving of MAI 32.23 was approved in *Ensor v. Hodgeson,* 615 S.W.2d 519 (Mo.App.1981), in which recovery for the wrongful death of a motorcycle rider was sought on strict liability grounds for a defect in the motorcycle. There was evidence that the motorcycle had "cut out" while traveling on divided three-lane I–55. A motorist, following behind, struck the motorcycle, killing the operator. Plaintiff's theory against the motorcycle dealer and manufacturer was that paint had chipped off the inside of the gas tank, clogging the fuel system, causing the motorcycle to cut out and that the paint chipping was a result

---

**5.** "Contrary to what is said in Judge Donnelly's dissent, this opinion does not eliminate the giving of MAI 32.23 in an appropriate case." *Lippard,* at 493.

**6.** MAI 32.23 was given in *Limbocker v. Ford Motor Co.,* 619 S.W.2d 757, 759 (Mo.App.1981). Judgment for defendant was affirmed. Plaintiff apparently did not challenge the sufficiency of the evidence supporting giving of the instruction. The case is noteworthy because plaintiff's claim of products liability theory was that a Ford tractor which overturned and pinned the operator beneath it should have been equipped with a rollover protective structure. Plaintiff's expert said the tractor overturned when the center of gravity moved over the line of the wheels on the right side (as the tractor was being operated on a slope which the operator had been warned to avoid because it was too steep.)

of a defective design. There was evidence that the rider had told his parents as he left home shortly before the accident that the dealer had solved the "cutting out" problem; that it was caused by a heavy key ring that was turning the ignition switch to the "off" position. The motorcyclist's parents (plaintiffs) appealed from a verdict against them, claiming error in the giving of MAI 32.23. The court approved the giving of the instruction, saying:

> In the light most favorable to the defendants, defendants' expert's testimony tended to discount the key ring theory of the problem and tended to show that Chris Ensor ... knew that his cycle was prone to "cut out" while running on the highway, and there is evidence from which a jury could reasonably infer that he knew the problem had not been remedied. This is sufficient to support a contributory fault instruction.

> *       *       *       *       *       *

> [K]nowledge of the precise engineering explanation of the defect is not necessary. It is sufficient that the user realizes that there is a problem with the product that renders it dangerous to use. Certainly, it is reasonable to infer that Chris Ensor, a sixteen year old of at least normal intelligence, was aware that he would be in a dangerous situation if his motorcycle stalled on the highway.

*Ensor, supra,* at 525. The *Ensor* case was decided before *Lippard.*

In *Love v. Deere & Co., supra,* plaintiff's hand became entangled in the moving parts of a combine at a point where a shield had fallen off, exposing belts and pulleys. The trial court instructed the jury using comparative fault instructions and submitting the issue of contributory negligence. A requested submission of MAI 32.23 was refused. The jury assessed Love's fault at 90 percent and defendants' at 10 percent. *Lippard* was decided while *Love v. Deere* was on appeal. Love argued that based

upon the *Lippard* holding, they were entitled to judgement for the full amount of the damages. That argument was rejected.

> [T]he *Lippard* Court specifically held that there was no evidence ... to support an instruction in the form of MAI 32.23..... For that reason, the Court could disregard the percentage of fault assessed against the plaintiff and enter judgment on the full amount of the verdict. But in this case, the evidence tending to prove Love intentionally grasped the moving belt would support the giving of MAI 32.23, though it was refused.

*Love v. Deere & Co., supra,* at 789–90.

Following *Lippard,* the giving of MAI 32.23 was approved in *Harper v. Namco, supra,* at 637, and contributory fault was recognized as a complete defense to strict liability. In analyzing what facts warrant submission of the contributory fault defense to a jury, the court observed:

> [P]laintiff was experienced and educated in the repair of farm equipment and rebuilt this particular piece of equipment making it operative. He was aware of its operation and the dangers of coming into contact with the beaters, and arguably, that is why he initially disengaged the power. However, he knowingly took a risk by re-engaging the power and trying to repair the broken chain. The plaintiff admits knowledge of the risk of physical damage to his body by contact with the beaters. Knowledge of such a danger is transferable to contact with his clothing. Such action on the part of plaintiff amounts to plaintiff voluntarily and unreasonably exposing himself to a known danger. Hence, the submission of MAI 32.23 was appropriate.

*Harper, supra,* at 638. In *Harper v. Namco, Inc.,* the court observed that the standards set forth in *Lippard* seemed very close to those required by the legal principle of "assumption of risk."[7] *Harper,* at 637. This court would agree with

---

**7.** The maxim "volenti non fit injuria" (also    known as assumption of the risk), means that if

that observation. In PROSSER AND KEETON ON TORTS, § 68 at 486–87 (5th ed.1984), assumption of risk is discussed as follows:

The defense of assumption of risk is in fact quite narrowly confined and restricted by two or three elements or requirements: first, the plaintiff must know that the risk is present, and he must further understand its nature; and second, his choice to incur it must be free and voluntary....

"Knowledge of the risk is the watchword of assumption of risk." Under ordinary circumstances the plaintiff will not be taken to assume any risk of either activities or conditions of which he has no knowledge. Moreover, he must not only know of the facts which create the danger, but he must comprehend and appreciate the nature of the danger he confronts.

■ Factual situations in Missouri where the giving of assumption of risk instructions have been approved or the court has indicated the facts warranted giving of assumption of risk instructions, include: (a) playing in church league softball game, *Ross v. Clouser,* 637 S.W.2d 11, 14 (Mo. banc 1982); (b) continuing to dance on a hotel ball room floor after plaintiff knew too much wax had been put on the floor and knew there was a danger of falling, *Terry v. Boss Hotels, Inc.,* 376 S.W.2d 239 (Mo.1964); (c) welding on metal drum which had been previously used to store an explosive antifreeze mixture (Zerone) where plaintiff knew Zerone was explosive; knew that in welding on a Zerone drum it would explode if it got heat into it and it was "closed up," *Fletcher v. Kemp,* 327 S.W.2d 178, 182–83 (Mo.1959). The common thread in the cases where assumption of risk instructions have been approved is that there must be facts from which a jury can find that a plaintiff intelligently consented to assume the risk knowing what the real danger of injury was. *Turpin v.*

*Shoemaker,* 427 S.W.2d 485, 490 (Mo.1968). Assumption of risk defense has been held to be inapplicable where the exposure to harm or injury results from facts, circumstances and surroundings which constitute a real inducement to expose one's self to the danger, as where the injured person surrenders his better judgment as a result of an assurance of safety for himself, or even safety for property. *Bullock v. Benjamin Moore and Company,* 392 S.W.2d 10, 13–15 (Mo.App.1965).

■ In the case at bar, this court finds that there was presented a fact situation in which the jury might find for defendants on the defense of contributory fault on the theory that plaintiff, aware of the risk created by the lack of a rollover protection system on the JD–300, voluntarily encountered the risk reasonably and with caution. Evidence which would enable a jury to find that plaintiff had knowledge of the danger that existed from the lack of rollover protection on the JD–300 includes the facts that: (a) plaintiff was an experienced operator of backhoe type equipment (he had been operating this machine or a similar model since 1978); (b) he had operated tractors, backhoes, cable plows, some of which had roll bars and some did not; (c) he knew that the JD–300 he was operating on September 13, 1983, did not have a roll bar (he was involved in the initial purchase of the equipment and had used it frequently); (d) he was aware that tractors and backhoes could roll over; and (e) he knew that if a tractor rolled on top of him, it would injure or kill him. There were also facts from which a jury could find that plaintiff appreciated and comprehended the danger present in trying to extricate the JD–300 when it had no ROPS and is, therefore, barred from recovery because the injury he sustained resulted from a risk which he accepted and brought upon himself. Such facts include plaintiff's admission that he understood the theoretical kind of protec-

one, knowing and comprehending the danger, voluntarily exposes himself to it, ... he is deemed to have assumed the risk and is preclud-

ed from a recovery for an injury resulting therefrom. BLACK'S LAW DICTIONARY 1575 (6th ed.1990).

tion roll bars provided; that roll bars provide a "race car type" of protection; and he knew this backhoe did not have a roll bar. Plaintiff argues that Deere and Huff failed to present any evidence that plaintiff knew and appreciated the risk of a rollover from the procedure he was employing at the time of the accident; hence, it was error to give MAI 32.23. However, that argument ignores the theory under which plaintiff was proceeding.

It was not plaintiff's claim that he was injured because the machine was unstable and rolled over. His theory, and the evidence supporting it, was that the machine was defective because it did not have a ROPS. Therefore, the evidence relating to the affirmative defense of contributory fault properly addressed the plaintiff's knowledge of the danger of using the equipment without a ROPS. It was not necessary for Deere and Huff to offer evidence of plaintiff's knowledge that this particular maneuver could injure him. Plaintiff's argument is also non-persuasive, when viewed in light of plaintiff's admission, that he knew that placing the boom downhill caused the equipment to be over its center of gravity; hence, subject to rollover. He also knew that raising the stabilizers off the ground eliminated stability to the tractor. Yet, knowing those facts, he did both; i.e., placed the backhoe boom downhill and raised the stabilizers in his attempt at executing the last extraction maneuver.

There was evidence from which a jury could find that plaintiff voluntarily exposed himself to the danger, i.e., that plaintiff was not acting under any emergency; that he carefully went through five maneuvers in his continuing effort to extract the equipment from the rip line; that he was not compelled to act as he did, and could have at any time (up until the accident) walked away and gone for help without incurring any penalty from his employer (as he had indeed done in the past). Plaintiff argues that he did not voluntarily assume the risk because he was an employee

(rather than self-employed as in *Harper*); he was alone and did not have the option of using a JD–300 with a ROPS. Such argument is drawn from the early master-servant cases where assumption of risk defenses were not available in an action founded on the negligence of the master. Clearly, contributory fault is a defense to a strict liability case, and plaintiff's argument is rejected.

Finally, there was evidence from which a jury might have found plaintiff unreasonably exposed himself to the danger of being pinned beneath the tractor which he knew was not equipped with ROPS when: (a) prior to the accident, the JD–300 was on a steep slope; (b) he knew that when operating on a slope, the weight of the machine should not be placed on the low side because doing so would change the center of gravity, making the machine less stable, which can lead to a rollover; (c) after going through earlier unsuccessful maneuvers, he intentionally shifted the weight of the machine to the low side by moving the backhoe boom and backhoe bucket to the bottom side of the ditch; (d) he tried twice to use the backhoe boom to push the tilted machine up the hill and out of the rip line (both times, when he began to lift the backhoe bucket, the machine began to roll (overturn) and he put the boom back down to brace it and keep it from overturning; and, finally, (e) he used the backhoe boom and bucket to pull the rear of the machine downhill and succeeded by rolling the machine over. Plaintiff argues that the facts in this case distinguish it from *Harper v. Namco, Inc.*, because, here, plaintiff was employing a different maneuver than had been tried earlier when the JD–300 rolled; whereas, in *Harper*, the plaintiff had initially encountered the danger and thereafter decided to employ the same procedure.

In making such argument, plaintiff ignores his own theory; i.e., that the lack of ROPS was what made the machine defective. Plaintiff admittedly knew that the JD–300 was unstable once he put the boom

downhill, raised the bucket loader and raised the stabilizers. That fact was demonstrated to him twice when the tractor started to roll. He knew the tractor was without ROPS; yet, with that knowledge, he continued to encounter the danger of rollover of a machine that did not have ROPS by moving the boom downhill, raising the loader bucket and raising the stabilizers in a continuing effort to remove the JD–300 from the rip line. There was no hidden, lurking or secret peril involved in the use of this allegedly defective JD–300. There was evidence from which a jury could find that whatever danger existed from the operation of this JD–300 without the ROPS was not only obvious to plaintiff but was actually known and appreciated by plaintiff; and, having that knowledge, he voluntarily and unreasonably assumed the risk of overturn of the machine without the ROPS. The giving of MAI 32.23 was warranted. No error is found in the giving of that instruction. Point II(A) is rejected.

■ In Point II(B) plaintiff claims trial court error in admitting evidence of plaintiff's alleged negligence. Clearly, contributory negligence, now comparative fault, was not available to Deere and Huff as a defense. *Lippard v. Houdaille Industries, Inc., supra.* Thus, evidence of negligence on the part of plaintiff was not admissible. However, as is carefully spelled out in *Terry v. Boss Hotels, Inc., supra,* there are cases in which the fact situation might permit a jury to find for the defendant on the defense of assumption of risk or, alternatively, under the same evidence, the jury might find for the defendant on the defense of contributory negligence. Similarly, by the very nature of the contributory fault defense, some facts which support that defense might also support a de-

fense of comparative fault (contributory negligence) but for the fact that such defense was not available. Defendants Deere and Huff were entitled to plead contributory fault as a defense and offer evidence in support thereof. *Lippard v. Houdaille Industries, Inc.; Keener v. Dayton, supra.* To exclude evidence that supports the contributory fault defense merely because such evidence would also support the prohibited comparative fault submission (contributory negligence) would be meaningless. There is no indication in *Keener v. Dayton* nor in *Lippard v. Houdaille* that the contributory fault defense was to be so limited.

Specifically, respondent argues trial court error in permitting Deere and Huff to ask plaintiff: (a) if he had ever been penalized in the past for "getting stuck" or going for assistance in the past if he did get stuck; (b) if he was "perched on the side of the slope ... and ... had tried pushing [himself] out ..."; and (c) a series of questions about his knowledge of the propensity of the JD–300 to be unstable and rollover and his knowledge of the risk and dangers associated with the overturning of the equipment when it was not equipped with ROPS. Review of each of the questions was relevant to the defense of contributory fault. No error was committed by the trial court in allowing introduction of this evidence. Point II(B) is denied.

Plaintiff complains of trial error in Point II(C) in the giving of contributory fault instructions and in denying plaintiff's requested Instructions A, B, C and D because plaintiff claims "there was no evidence to support the giving of either single or multiple contributory fault instructions."[8] The portion of Point II(C) which asserts that

---

**8.** Deere asserts in its brief that plaintiff's Point II(C) does not comply with Rule 84.04(e) in that only Instruction No. 6 is set forth in the argument portion of the brief. Further, the court notes that Instructions A, B, C and D are not in the legal file but are in the Appendix to the brief. Failure to comply with briefing rules is not encouraged, but the instructions are in the appendix. Parties are entitled to have their disputes resolved on the merits. Huff complains that the argument in Point II(C) is so confusing and unrelated to the Point Relied On as to be nearly indecipherable. The court agrees with that observation but will address the point.

there was no evidence to support the giving of contributory fault instructions has been answered and rejected as a part of Point II(A) above.

■■■■■ As a part of Point II(C), plaintiff argues that the instructions were erroneous in that they directed the jury to return a verdict for defendants, as an absolute defense, when the instructions, if given at all, should have directed the jury to assign a percentage of fault to the plaintiff if the elements in the instructions were found. This argument is without merit. The trial court must follow MAI; Instructions No. 6 and 8 were the exact pattern instruction mandated as MAI 32.23. No reason is assigned by plaintiffs as to why MAI 32.23 (Instructions No. 6 and 8) should have been changed or modified. To deviate from MAI 32.23, or to fail to follow that instruction when no reason for modification is shown, would have constituted error, presumably prejudicial error. Rule 70.-02(b), (c); *Venable v. S.O.R., Inc.*, 713 S.W.2d 37, 40 (Mo.App.1986). The verdict directing instructions offered by plaintiff and given by the court (Instructions No. 5 and 7) were MAI 25.04, without change or modification. No reason is assigned by plaintiffs as to why, if MAI 32.23 is given, it should be modified to go back to the language of MAI 19.01 (which is apparently what plaintiff urges). Plaintiff's argument (as best it can be perceived) is clearly answered in *Love v. Deere & Co., supra,* at 788–89:

> Thus, under *Lippard* a products liability case is submitted to a jury on an "all or nothing at all basis." *Earll v. Consolidated Aluminum Corp.,* 714 S.W.2d 932, 937[4] (Mo.App.1986). Apportionment of fault (and hence, damages) between the plaintiff and defendant is not possible, but contributory fault of the type outlined in MAI 32.23 completely precludes recovery.

■■■ Finally, in the last argument in Point II(C), plaintiff complains of error in giving two contributory fault instructions, citing *Cornell v. Texaco, Inc.,* 712 S.W.2d 680 (Mo.banc 1986), as authority for his argument. At the instruction conference, the trial judge specifically told the parties that there were two issues; first, whether the contributory fault instruction should be given and, second, whether it should be given in one instruction or each defendant would be entitled to a separate instruction. Plaintiff thereupon made a lengthy objection, giving reasons why the contributory fault instruction should not be given. That objection was overruled. No specific objection was made by plaintiff to the giving of separate contributory fault instructions (other than a general, non-specific objection made by plaintiffs as to all instructions). In keeping with *Cornell v. Texaco, supra,* at 682–83, this court finds that if the giving of the dual instructions was error, it was not prejudicial; particularly where, in this case, the trial judge specifically brought to the attention of plaintiff's counsel his intention to give a separate contributory fault instruction as to each defendant. The giving of the instructions was specifically objected to by plaintiff's counsel but not because of the dual submission; rather, on the basis that the evidence did not support the giving of them. If the possibility of undue emphasis by giving separate affirmative defense instructions did not appear to plaintiff's counsel, it certainly is unlikely the jury would have been misled. In addition, the verdict director against Deere (Instruction No. 5) postulated manufacture and sale of the new backhoe in 1969, while the verdict director against Huff (Instruction No. 7) involved a resale of the used backhoe in 1981. Conceivably, the jury might have found that the product was not defective when manufactured in 1969 but was defective when resold in 1981 by reason of possible changes in the design or other reasons.

This court finds no error in the giving of two affirmative defense instructions under the facts of this case. Further, even if it was error, it was not prejudicial. Point II(C), in all of its parts, is ruled against plaintiff.

The judgment for defendants Deere and Huff is affirmed.

FLANIGAN, C.J., and HOGAN, J., concur.